**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| ASYLUM SEEKER ADVOCACY PROJECT,<br><br>      Plaintiff,<br><br>v.<br><br>U.S. CITIZENSHIP AND IMMIGRATION SERVICES,<br><br>      Defendant. |

**Case No. 25-cv-02133-ALC**

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION GRANTING ITS REQUEST FOR <u>EXPEDITED PROCESSING OF ITS FOIA REQUEST</u>**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

RELEVANT FACTUAL AND PROCEDURAL BACKGROUND .................................. 3

LEGAL STANDARD ..................................................................................................... 7

ARGUMENT ................................................................................................................. 8

I.    ASAP Is Likely to Succeed on the Merits that Its FOIA Request Warrants Expedited
      Processing ............................................................................................................. 8

      A.    It Is Urgent that ASAP, An Organization Primarily Engaged in Disseminating
            Information, Inform the Public About the Benefits Pause Memo ................................. 8

      B.    The Benefits Pause Memo Impacts People's Lives and Physical Safety .................... 12

      C.    The Benefits Pause Memo Involves the Loss of Substantial Due Process Rights........ 15

II.   The Public, ASAP, and Hundreds of Thousands of Directly Impacted Individuals Will
      Be Irreparably Harmed Absent the Requested Injunctive Relief ................................. 16

      A.    The Public Is Irreparably Harmed by the Inability Access the Benefits Pause Memo. 16

      B.    ASAP Is Irreparably Harmed by the Inability to Promptly and Fully Inform Its
            Members and the Public About the Benefits Pause Memo ......................................... 17

      C.    Directly Impacted People Are Irreparably Harmed by the Inability to Make Informed
            Decisions on Time-Sensitive and Complex Matters in Their Immigration Cases ....... 19

III.  The Balance of Equities and the Public Interest Favor Injunctive Relief ................... 23

CONCLUSION ............................................................................................................. 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Al-Fayed v. CIA*,
    254 F.3d 300 (D.C. Cir. 2001) ................................................................. 9

*Am. C.L. Union v. U.S. Dep't of Just.*,
    321 F. Supp. 2d 24 (D.D.C. 2004) ......................................................... 7

*Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*,
    470 F. Supp. 3d 32 (D.D.C. 2020) ......................................................... 18

*Am. Oversight v. U.S. Dep't of State*,
    414 F. Supp. 3d 182 (D.D.C. 2019) ....................................................... 22

*Bloomberg, L.P. v. U.S. Food & Drug Admin.*,
    500 F. Supp. 2d 371 (S.D.N.Y. 2007) ................................................... 9

*Brennan Ctr. for Just. at NYU Sch. of L. v. Dep't of Com.*,
    498 F. Supp. 3d 87 (D.D.C. 2020) ................................................. 9, 12, 17

*Brennan Ctr. v. U.S. Dep't of Just.*,
    No. 17-cv-6335, 2018 WL 637424 (S.D.N.Y. Jan. 31, 2018) ............ 16, 17

*Brenntag Int'l Chems., Inc. v. Bank of India*,
    175 F.3d 245 (2d Cir. 1999) ................................................................... 23

*CASA, Inc. v. Noem*, No. 25-cv-00525 (D. Md. Feb. 20, 2025) ................... 5

*Ctr. for Pub. Integrity v. U.S. Dep't of Defense*,
    411 F. Supp. 3d 5 (D.D.C. 2019) .......................................... 7, 17, 23, 24

*Doe v. Noem*,
    No. 25-cv-10495 (D. Mass. Feb. 28, 2025) ..................................... 4, 14

*Drax v. Reno*,
    338 F.3d 98 (2d Cir. 2003) ..................................................................... 19

*Dunlap v. Presidential Advisory Comm'n on Election Integrity*,
    286 F. Supp. 3d 96 (D.D.C. 2017) ......................................................... 18

*Goldstein v. Hochul*,
    680 F. Supp. 3d 370 (S.D.N.Y. 2023) ................................................... 23

*Jacksonville Port Auth. v. Adams*,
    556 F.2d 52 (D.C. Cir. 1977) ................................................................. 23

*JTH Tax, LLC v. Agnant*,
   62 F.4th 658 (2d Cir. 2023) ................................................................. 8

*Lin v. Holder*,
   763 F.3d 244 (2d Cir. 2014) .............................................................. 20

*Lok v. Immigr. & Naturalization Serv.*,
   548 F.2d 37 (2d Cir. 1977) ................................................................ 19

*Make the Road N.Y. v. Huffman*,
   No. 25-cv-00190 (D.D.C. Jan. 22, 2025) .............................................. 5

*N.Y. Times Co. v. Def. Health Agency*,
   No. 21-cv-566, 2021 WL 1614817 (D.D.C. Apr. 25, 2021)....................... 22

*Nat'l Archives & Recs. Admin. v. Favish*,
   541 U.S. 157 (2004)......................................................................... 17

*Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't*,
   236 F. Supp. 3d 810 (S.D.N.Y. 2017) .................................................. 12

*Nat'l TPS All. v. Noem*,
   No. 25-cv-01766 (N.D. Cal. Feb. 19, 2025) ............................................ 5

*New York ex rel. Schneiderman v. Actavis PLC*,
   787 F.3d 638 (2d Cir. 2015)............................................................... 17

*NLRB v. Robbins Tire & Rubber Co.*,
   437 U.S. 214 (1978)......................................................................... 19

*Pacito v. Trump*,
   No. 25-cv-255 (W.D. Wash. Feb. 10, 2025) ............................................ 5

*Payne Enters., Inc. v. United States*,
   837 F.2d 486 (D.C. Cir. 1988). ...................................................... 17, 22

*Protect Democracy Project, Inc. v. U.S. Dep't of Def.*,
   263 F. Supp. 3d 293 (D.D.C. 2017) .............................................. 10, 11, 12

*Protect Democracy Project, Inc. v. U.S. Dep't of Just.*,
   498 F. Supp. 3d 132 (D.D.C. 2020) ................................................. 17, 24

*Refugee and Immigr. Ctr. for Educ. & Legal Servs. v. Noem*,
   No. 25-cv-00306 (D.D.C. Feb. 3, 2025) ................................................. 5

*Stevens v. U.S. Dep't of Health and Hum. Servs.*,
666 F. Supp. 3d 734 (N.D. Ill. 2023) ................................................ 14, 18

*U.S. Conf. of Cath. Bishops v. Dep't of State*,
No. 25-cv-00465 (D.D.C. Feb. 18, 2025) ............................................. 5

*Wash. Post v. U.S. Dep't of Homeland Sec.*,
459 F. Supp. 2d 61 (D.D.C. 2006) ..................................................... 23

**Statutes**

5 U.S.C. § 552(a)(6)(E) .................................................................... 1, 6

5 U.S.C. §§ 552(a)(6)(E)(i)(I) ......................................................... 8, 23

5 U.S.C. § 552(a)(6)(E)(i)(II) ......................................................... 8, 23

5 U.S.C. § 552(a)(6)(E)(iii) ............................................................... 7

5 U.S.C. § 552(a)(6)(E)(v) ................................................................ 11

5 U.S.C. § 552(a)(6)(E)(v)(I) ......................................................... 6, 13

5 U.S.C. § 552(a)(6)(E)(v)(II) ..................................................... 2, 6, 9

5 U.S.C § 552(a)(2)(B) ...................................................................... 24

5 U.S.C § 552(a)(4)(B) ........................................................................ 7

5 U.S.C. § 552(a)(6)(E)(v)(I) ......................................................... 2, 13

5 U.S.C. § 552(a)(6)(E)(v)(II) ............................................................. 9

8 U.S.C. § 1158(a)(2)(B) .................................................................... 20

**Regulations**

6 C.F.R. § 5.5(e)(1) .......................................................................... 1, 6

6 C.F.R. § 5.5(e)(1)(i) ................................................................. 2, 6, 12

6 C.F.R. § 5.5(e)(1)(ii) .................................................................. 2, 6, 9

6 C.F.R. § 5.5(e)(1)(iii) .............................................................. 2, 6, 8, 15

6 C.F.R. § 5.5(e)(3) .......................................................................................................... 9

6 C.F.R § 5.8(e) .............................................................................................................. 7

**Other Authorities**

U.S. S. Comm. on Appropriations, BILL SUMMARY: Homeland Sec'y Fiscal Year 2024
    Appropriations Bill (Mar. 21, 2024),
    https://www.appropriations.senate.gov/news/majority/bill-summary-homeland-security-fiscal-year-2024-appropriations-bill-2 ........................................................................... 20

Benjamine C. Huffman, *Guidance Regarding How to Exercise Enforcement Discretion* (Jan. 23,
    2025),
    https://www.dhs.gov/sites/default/files/2025-01/25_0123_er-and-parole-guidance.pdf .............. 15

U.S. Citizenship & Immigr. Servs., *Automatic Employment Authorization Document (EAD)
    Extension* (Jan. 13, 2025),
    https://www.uscis.gov/eadautoextend .......................................................................... 21

U.S. Citizenship & Immigr. Servs., Policy Memorandum: Issuance of Notices to Appear
    (NTAs) in Cases Involving Inadmissible and Deportable Aliens (Feb. 28, 2025),
    https://www.uscis.gov/sites/default/files/document/policy-alerts/NTA_Policy_FINAL_2.28.25_FINAL.pdf ................................................................. 24

U.S. Dep't of Homeland Sec., *Designating Aliens for Expedited Removal* (Jan. 21, 2025),
    https://public-inspection.federalregister.gov/2025-01720.pdf .................................................. 15

## <u>INTRODUCTION</u>

This case is about the urgent need for Defendant U.S. Citizenship and Immigration Services ("USCIS") to expeditiously process and release **one document** under the Freedom of Information Act ("FOIA"). The single document—a February 14, 2025 memorandum issued by USCIS Acting Deputy Director Andrew Davidson ordering an agency-wide pause on all pending immigration benefit requests by noncitizens who entered the United States through certain parole programs (the "Benefits Pause Memo")—constitutes a policy directive that is currently in effect, directly impacts the lives of approximately 800,000 people to whom its terms apply, and indirectly impacts millions more. Yet this directive, which has been the subject of intense media coverage and speculation, remains hidden from the public.

On February 19, 2025, the same day the Benefits Pause Memo was first reported by CBS News,[1] Plaintiff Asylum Seeker Advocacy Project ("ASAP") submitted a FOIA request for the document with a request for expedited processing ("FOIA Request"). *See* Compl., Ex. 1 (FOIA Request). ASAP's FOIA Request demonstrated that ASAP satisfied three independent "compelling need" grounds for expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E) and the applicable regulation, 6 C.F.R. § 5.5(e)(1). Despite this showing, USCIS denied ASAP's expedited processing request without explanation.

There is robust public interest in the Benefits Pause Memo and how it fits into the puzzle of the new Administration's multitude of immigration policy announcements. But more importantly, every day that passes, hundreds of thousands of directly impacted people go without critical information they need to make both time-sensitive and life-altering decisions in their

---

[1] *See* Camilo Montoya-Galvez, *U.S. pauses immigration applications for certain migrants welcomed under Biden*, CBS News (Feb. 19, 2025), https://www.cbsnews.com/news/u-s-pauses-immigration-applications-for-certain-migrants-welcomed-under-biden/; *see also* Compl. ¶ 1 n.1 (referencing the CBS News story).

immigration cases, such as whether and when to submit their applications for asylum, and whether and when to apply to renew their work permits to USCIS. Similarly, immigration attorneys are unable to counsel their impacted clients on any number of complex immigration issues because the Benefits Pause Memo has not been disclosed.

ASAP easily establishes the elements that are prerequisites to the injunctive relief sought. First, ASAP is likely to succeed on the merits that its FOIA Request is entitled to expedited processing for three independent reasons, although the Court only need to find that ASAP satisfies one. As to ASAP, there is "[an] urgency to inform the public concerning actual or alleged Federal Government activity," given that ASAP is "primarily engaged in disseminating information." 5 U.S.C. § 552(a)(6)(E)(v)(II), 6 C.F.R. § 5.5(e)(1)(ii). Specifically, it is exceedingly urgent for ASAP to inform the public about the Benefits Pause Memo, which effectuates the federal government's decision to suspend immediately and indefinitely all immigration benefits applications for approximately 800,000 people. ASAP is well-positioned to inform the public about the Benefits Pause Memo, as an organization primarily engaged in harnessing technology to promptly disseminate information and resources to its 690,000 members. On this basis alone, ASAP is likely to succeed on the merits that expedited processing is required.

Alternatively, the lack of expedited processing could pose "an imminent threat to the life or physical safety" of thousands of people impacted by the pause who may be at imminent risk of detention or deportation. *See* 5 U.S.C. § 552(a)(6)(E)(v)(I), 6 C.F.R. § 5.5(e)(1)(i). ASAP also satisfies a third ground for expedited processing: the Benefits Pause Memo involves the "loss of substantial due process rights." 6 C.F.R. § 5.5(e)(1)(iii). The Benefits Pause Memo indefinitely suspends immigration benefit applications without giving applicants notice of or an

opportunity to challenge what amounts to a constructive denial.  This seriously implicates the impacted parolees' Fifth Amendment due process rights.

As to the second element for injunctive relief, ASAP and the hundreds of thousands of impacted parolees are suffering irreparable harm by the ongoing non-disclosure of the Benefits Pause Memo.  Without injunctive relief, ASAP will remain deprived of its ability to timely inform its members and the public about the contents and possible effects of the Benefits Pause Memo.  And for the roughly 800,000 people who are directly impacted by this Memo, failure to expeditiously process the FOIA Request almost certainly will cause irreparable harm to their immigration cases and career prospects, and may even risk their very lives should they be removed to countries from which they fled.

Third, the balance of equities and the public interest weigh decisively in favor of injunctive relief.  ASAP is statutorily entitled to expedited processing of its FOIA Request, and any conceivable burden that processing the FOIA Request for a single, non-exempt document places on USCIS would be negligible at most.

For these reasons, ASAP respectfully requests that the Court grant ASAP's motion for a preliminary injunction, ordering USCIS to expeditiously process ASAP's FOIA Request and promptly produce the Benefits Pause Memo.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

ASAP is a national 501(c)(3) nonprofit organization that works with its members—over 690,000 asylum seekers across the United States—to build a more welcoming United States for individuals fleeing persecution.  Compl. ¶ 9.  ASAP creates and disseminates public legal resources for its 690,000 members to help them navigate the immigration system, including guidance for individuals who entered the United States through a parole program and have

pending applications for immigration benefits such as work permits, asylum, Temporary

Protected Status ("TPS"), family-based petitions, adjustment of status, and others.[2]  *Id.* ¶¶ 10–11.

On February 19, 2025, CBS News broke the news of the Benefits Pause Memo, *i.e.*, the

February 14, 2025 memorandum issued by USCIS Acting Deputy Director Andrew Davidson

ordering an immediate agency-wide administrative pause on all pending immigration benefit

requests filed by people who entered the United States through certain parole processes.  *See*

Compl. ¶¶ 1, 15 & Compl., Ex. 1 at 1 n.1, 8–9.  Since then, several other news outlets, including

Bloomberg Law, NBC Miami, Fox News, and The National Law Review, have reported on the

Benefits Pause Memo.  *Id.* ¶ 21.

The affected parole processes include the Uniting for Ukraine Process ("U4U"), the

Process for Cubans, Haitians, Nicaraguans, and Venezuelans ("CHNV"), and the Family

Reunification Parole Process ("FRP").  *Id.* ¶ 15.  Upon information and belief, the FRP process

applies to certain nationals of Colombia, Ecuador, El Salvador, Guatemala, Honduras, Haiti, and

Cuba who have immediate family members in the United States through whom they are eligible

for family-based immigration relief.  *Id.*  Collectively, approximately 800,000 people were

welcomed to the United States on parole via U4U, CHNV, and FRP.  *Id.* ¶ 16 & n.3.  News

reports indicate that the benefits applications that are currently suspended by the Benefits Pause

Memo include, but are not limited to, work permits (including renewals), asylum, TPS,

family-based petitions, adjustment of status, and others.  *Id.* ¶ 17 & n.4.  Without timely access

to the Benefits Pause Memo, however, it is impossible to assess the full extent of its impact.  *Id.*

¶¶ 31–35.  For instance, with each day that passes, affected parolees are approaching time-

---

[2] *See, e.g.*, Asylum Seeker Advoc. Project, *How are laws changing for asylum seekers?* (Mar. 11, 2025),
https://help.asylumadvocacy.org/law-changes-jan-2025/.

sensitive deadlines to apply for asylum and work permits—benefits reportedly put on hold by the Benefits Pause Memo.  *Id.* ¶¶ 32–35.  Yet, without the Benefits Pause Memo, these individuals have no understanding of whether they can or should apply for such critical immigration benefits and thus risk missing key deadlines that will impact their ability to eventually obtain asylum or work authorization.  *Id.*

The Benefits Pause Memo is part of a blitz of immigration-related policy directives the Trump-Vance Administration has implemented since January 20, 2025, many of which have been challenged in litigation.[3]  Some of these policies have not been released through official channels but rather posted by news media outlets.  *Id.* ¶ 18.  There is intense public discussion and debate about these policies, including the Benefits Pause Memo.  *Id.* ¶¶ 20–21.  These immigration enforcement policies, on their own and in conjunction, have created confusion and uncertainty.  Directly impacted communities, and the legal assistance providers that serve them (including ASAP), are engaged in a monumental effort to discern the current state of the already complicated immigration laws and the lawfulness of the Administration's actions, and how to best proceed on individual and systemic bases.  *Id.* ¶ 22.

The policy announced in the Benefits Pause Memo directly and significantly impacts both ASAP's ability to provide accurate information to its members and the lives of hundreds of thousands of parolees living in the United States.  Thus, immediately after learning of the

---

[3] *See, e.g.*, *Make the Road N.Y. v. Huffman*, No. 25-cv-00190 (D.D.C. Jan. 22, 2025), ECF No. 1 (challenging Executive Order directing expansion of expedited removal); *Refugee and Immigr. Ctr. for Educ. & Legal Servs. v. Noem*, No. 25-cv-00306 (D.D.C. Feb. 3, 2025), ECF No. 1 (challenging Presidential Proclamation prohibiting, among other things, seeking asylum at the U.S. border); *Pacito v. Trump*, No. 25-cv-255 (W.D. Wash. Feb. 10, 2025), ECF No. 1 (challenging Administration's indefinite suspension of all refugee admissions and processing and suspension of federal funding for resettlement programs); *U.S. Conf. of Cath. Bishops v. Dep't of State*, No. 25-cv-00465 (D.D.C. Feb. 18, 2025), ECF No. 1 (same); *Doe v. Noem*, No. 25-cv-10495 (D. Mass. Feb. 28, 2025), ECF No. 1 (challenging termination of the parole programs U4U, CHNV, and Operation Allies Welcome); *CASA, Inc. v. Noem*, No. 25-cv-00525 (D. Md. Feb. 20, 2025) (challenging revocation of Venezuela TPS); *Nat'l TPS All. v. Noem*, No. 25-cv-01766 (N.D. Cal. Feb. 19, 2025) (same).

Benefits Pause Memo, ASAP submitted the FOIA Request to USCIS for that single document on February 19, 2025. *See* Compl., Ex. 1.

ASAP's FOIA Request explicitly sought only the Benefits Pause Memo and no other records. *Id.* ¶ 36 & Compl., Ex. 1 at 1. Additionally, given the urgent need to access this undisclosed federal policy and disseminate information about it to its members, ASAP asked that the agency expedite the processing of the FOIA Request pursuant to 5 U.S.C. § 552(a)(6)(E) and applicable regulations, 6 C.F.R. § 5.5(e)(1). Compl. ¶ 37 & Compl., Ex. 1 at 2–4. In requesting expedition, ASAP invoked three distinct grounds that require USCIS to expedite a FOIA request, explaining that (1) there is "[an] urgency [for ASAP] to inform the public concerning actual or alleged Federal Government activity" because the organization is "primarily engaged in disseminating information," 5 U.S.C. § 552(a)(6)(E)(v)(II), 6 C.F.R. § 5.5(e)(1)(ii); (2) the lack of expedited processing could pose "an imminent threat to the life or physical safety" of thousands of people impacted by the pause, 5 U.S.C. § 552(a)(6)(E)(v)(I), 6 C.F.R. § 5.5(e)(1)(i); and (3) the Benefits Pause Memo involves the "loss of substantial due process rights," 6 C.F.R. § 5.5(e)(1)(iii). *See* Compl. ¶ 37 & Compl., Ex. 1 at 2–4. Two days after ASAP submitted its FOIA Request, USCIS denied ASAP's expedited processing request without explanation. *See* Compl. ¶ 42 & Compl., Ex. 2.

As of March 14, 2025, the USCIS online portal for tracking FOIA requests, https://first.uscis.gov/#/check-status, stated that the "Place in Queue" of the FOIA Request as number "1304 of 1682 pending requests," the "Status" as "Files Received," and "Estimated Completion Date" as "03/28/2025"—a full six weeks after the Benefits Pause Memo has been in effect and potentially applied to hundreds of thousands of people. Compl. ¶ 43 & Compl., Ex. 3.

ASAP seeks to compel USCIS to expedite processing of the FOIA Request and promptly produce the Benefits Pause Memo, which is urgently needed to inform the public and the hundreds of thousands of people currently impacted by the undisclosed government policy.

## LEGAL STANDARD

The Court has jurisdiction and authority to grant all necessary injunctive relief where an agency denies a request for expedited processing of a FOIA request. 5 U.S.C. § 552(a)(6)(E)(iii) ("Agency action to deny . . . a request for expedited processing . . . shall be subject to judicial review under paragraph (4)."); *see also id.* § 552(a)(4)(B) ("[T]he district court . . . has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld."). Where, as here, the agency has improperly denied a request for expedited processing, the Court has the authority to issue a preliminary injunction ordering an agency to expeditiously complete its processing of a FOIA request and disclose non-exempt responsive records. *See, e.g.*, *Ctr. for Pub. Integrity v. U.S. Dep't of Defense*, 411 F. Supp. 3d 5, 8, 11, 14–15 (D.D.C. 2019) (granting a preliminary injunction ordering expedited processing and rolling record production of over 200 pages within 17 to 25 days of the court's order where agencies had denied and failed to respond to requests for expedited processing). A FOIA requestor may seek immediate judicial review of an agency's denial of an expedited processing request and need not first file an administrative appeal. 6 C.F.R § 5.8(e); *see also Am. C.L. Union v. U.S. Dep't of Just.*, 321 F. Supp. 2d 24, 28 (D.D.C. 2004) (judicial review of agency's denial of expedited processing request is appropriate where plaintiff did not appeal the decision to the agency).

As a general matter, courts may grant preliminary injunctive relief when the plaintiff demonstrates that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm absent injunctive relief; (3) the balance of equities tips in its favor; and (4) a preliminary

injunction is in the public interest.  *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023).

As detailed below, ASAP makes the requisite showing as to each factor.

## **ARGUMENT**

### **I.    ASAP Is Likely to Succeed on the Merits that Its FOIA Request Warrants Expedited Processing**

ASAP is likely to prevail on its sole cause of action that USCIS violated its statutory

obligation to expedite the processing of ASAP's FOIA Request, on three independent grounds.

A requestor seeking expedited FOIA processing must establish a "compelling need" for

the records requested, or show it qualifies under another reason set out by the relevant agency.  5

U.S.C. § 552(a)(6)(E)(i)(I)–(II).  Under FOIA, a "compelling need" means that (i) there is an

"urgency to inform the public concerning actual or alleged Federal Government activity" when

the request is "made by a person primarily engaged in disseminating information," *or* (ii) failure

to obtain the records "could reasonably be expected to pose an imminent threat to the life or

physical safety of an individual."  *Id.* § 552(a)(6)(E)(v).  Additionally, Department of Homeland

Security ("DHS") regulations require USCIS to expedite processing if a FOIA request involves,

in pertinent part, "[t]he loss of substantial due process rights."  6 C.F.R. § 5.5(e)(1)(iii).  ASAP

satisfies each of these independent grounds for expedition and made such a showing in its FOIA

Request.  Though ASAP meets all three standards, this Court need only find that ASAP is likely

to succeed on one to rule in its favor.

#### **A.  It Is Urgent that ASAP, An Organization Primarily Engaged in Disseminating Information, Inform the Public About the Benefits Pause Memo**

First, a "compelling need" for expedition exists here because there is an "urgency [for

ASAP] to inform the public concerning actual or alleged Federal Government activity," as an

organization "primarily engaged in disseminating information." 5 U.S.C. § 552(a)(6)(E)(v)(II); 6 C.F.R. § 5.5(e)(1)(ii).

1. <u>There is an Urgency to Inform the Public About the Benefits Pause Memo</u>

It is exceedingly urgent that the public be informed about the Benefits Pause Memo, which effectuates the federal government's decision to suspend all immigration benefits applications for approximately 800,000 people. *See* 5 U.S.C. § 552(a)(6)(E)(v)(II); Compl. ¶¶ 15–16.

An "urgency to inform the public" exists where the FOIA request "concerns a matter of current exigency to the American public" and "the consequences of delaying a response would compromise a significant recognized interest." *Bloomberg, L.P. v. U.S. Food & Drug Admin.*, 500 F. Supp. 2d 371, 377 (S.D.N.Y. 2007) (quoting *Al-Fayed v. CIA*, 254 F.3d 300, 310 (D.C. Cir. 2001)). "In other words, the event at issue must be the subject of a currently unfolding story." *Brennan Ctr. for Just. at NYU Sch. of L. v. Dep't of Com.*, 498 F. Supp. 3d 87, 98 (D.D.C. 2020) (alteration, internal quotation marks, and citation omitted).

This Administration's treatment of people who were welcomed to the United States via parole processes is a currently developing story with significant consequences. Compl. ¶¶ 20–21. In its FOIA Request, ASAP cited "numerous [published] articles" on the federal government's separate action suspending various parole programs (which, in conjunction with the Benefits Pause Memo, is a one-two punch directed at parolees), which make plain that there is "an 'urgency to inform' the public on the topic." 6 C.F.R. § 5.5(e)(3); *see* Compl. ¶ 29 & Compl., Ex. 1 at 3 n.5, 7. Moreover, since ASAP filed its FOIA Request, several additional prominent news outlets have continued to report on the Benefits Pause Memo and its impact on

9

immigrant communities across the United States.[4]  Compl. ¶ 21.  This extensive attention from national media outlets demonstrates that there is intense public interest in the Benefits Pause Memo.  *See Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 263 F. Supp. 3d 293, 299 (D.D.C. 2017) (concluding that "widespread media attention—including by some of the nation's most prominent news outlets" is "strong evidence of an 'urgency to inform' the public").

The government's decision to indefinitely suspend "all immigration applications," including asylum, work permits, TPS, family petitions, and adjustment of status applications, for certain parolees has already gone into effect.  *See* Compl. ¶ 15 & Compl., Ex. 1 at 3 & Ex. A. Yet without the Benefits Pause Memo, the public has no knowledge of what the policy is, the policy's details or rationale, or who is impacted.  USCIS's failure to disclose the Benefits Pause Memo compromises the public's interest in "obtaining in a timely fashion information vital to the current and ongoing debate" surrounding immigration benefits.  *Protect Democracy Project, Inc.*, 263 F. Supp. 3d at 299–300 (holding in the context of an expedited processing request that "[b]eing closed off from . . . debate [in high-profile government action] is itself a harm in an open democracy" that compromises a significant recognized interest); *see also* Compl. ¶¶ 23–28.

2.  ASAP Is an Organization Primarily Engaged in Disseminating Information

ASAP is an organization "primarily engaged in disseminating information," 5 U.S.C. § 552(a)(6)(E)(v), because "information dissemination [is its] main activity," *Protect Democracy*

---

[4] *See, e.g.*, Andrew Kreighbaum, *Trump Freezes Immigration Benefits for Ukrainians Who Fled to US*, BLOOMBERG L. (Feb. 19, 2025), https://news.bloomberglaw.com/daily-labor-report/dhs-freezes-visas-other-benefits-for-immigrants-paroled-into-us; *US pauses immigration applications for migrants under 3 major parole programs*, NBC MIA. (Feb. 19, 2025), https://www.nbcmiami.com/on-air/as-seen-on/us-pauses-immigration-applications-for-migrants-under-3-major-parole-programs/3547963/; Adam Shaw & Peter Pinedo, *Trump freezes applications for Biden-era migrant programs amid fraud, national security concerns*, FOX NEWS (Feb. 19, 2025), https://www.foxnews.com/politics/trump-admin-freezes-applications-biden-era-migrant-programs-amid-fraud-national-security-concerns; Caterina Cappellari, *USCIS Memo Pauses TPS, Asylum, EAD, Other Applications from Parolees*, THE NAT'L L. REV. (Feb. 24, 2025), https://natlawreview.com/article/uscis-memo-pauses-tps-asylum-ead-other-applications-parolees.

*Project, Inc.*, 263 F. Supp. 3d at 298 (internal quotation marks and citation omitted).  ASAP easily meets this standard, as frequent dissemination of information to its hundreds of thousands of members is core to ASAP's mission.

ASAP is a national non-profit organization that seeks to build a more welcoming United States for individuals fleeing persecution, by, among other things, frequently communicating with its 690,000 members about federal immigration policy.  Compl. ¶ 9.  ASAP shares news and information about the immigration system to its hundreds of thousands of members via detailed resources and breaking news alerts on its website, social media accounts, YouTube channel with informational videos, and monthly emails and text messages to all its members, which are collectively accessed millions of times.  *Id.* ¶ 10 & Compl., Ex. 1 at 1–4.[5]  Indeed, ASAP recently published on its website news about the Benefits Pause Memo and potential implications for impacted members, albeit while being hamstrung by the non-disclosure of the document.[6]  *Id.* ¶ 11 & n.2.

ASAP collaborates frequently with national print and news media to highlight issues impacting asylum seekers.[7]  *Id.* ¶ 12.  Further, as stated in its FOIA Request, ASAP plans to

---

[5] *See generally* ASAP's website, available at: https://help.asylumadvocacy.org/; ASAP's Youtube Channel, available at: https://www.youtube.com/@asylumadvocacy; *see also* Asylum Seeker Advoc. Project, *1 Million Asylum Seekers Standing Together*, https://www.asylumadvocacy.org/member-data/.

[6] *See* Asylum Seeker Advoc. Project, *How are laws changing for asylum seekers?* (Mar. 11, 2025), https://help.asylumadvocacy.org/law-changes-jan-2025/.

[7] Indeed, ASAP's work and its members have repeatedly been featured in prominent media outlets including The Washington Post, The New York Times, The Wall Street Journal, USA Today, CBS News, The Atlantic, Telemundo, Univision, The Hill, Associated Press, ABC News, and The Guardian, among others.  *See, e.g.*, Miriam Jordan, *Migrants Separated From Their Children Will Be Allowed Into U.S.*, N.Y. TIMES (May 3, 2021), https://www.nytimes.com/2021/05/03/us/migrant-family-separation.html (quoting ASAP co-Executive Director Conchita Cruz); Rafael Bernal, *Mayors ask DHS to extend migrant work permits*, THE HILL (Feb. 12, 2024), https://thehill.com/latino/4463771-mayors-dhs-migrant-work-permits/ (quoting an ASAP member); Catherine Rampell, *Families like this one were torn apart at the border.  The U.S. still hasn't made things right*, WASH. POST (Nov. 23, 2020), https://www.washingtonpost.com/graphics/2020/opinions/separated-families-border-us-immigration-trump-biden/ (in-depth story featuring two ASAP members and clients); Julia Preston, *'No words for the anxiety': migrants desperate for jobs trapped in US asylum maze*, THE GUARDIAN (Sept. 10, 2023), https://www.theguardian.com/us-news/2023/sep/10/us-immigration-work-permits-asylum-maze; Michelle Hackman,

share the Benefits Pause Memo with the public, its members, and interested media outlets. *Id.* &
Compl., Ex. 1 at 3–4.

Courts have routinely held that these representations by organizations like ASAP
establish that a requestor is "primarily engaged in disseminating information." *See Protect
Democracy Project, Inc.*, 263 F. Supp. 3d at 298 (non-profit organization "primarily engaged in
disseminating information" for purposes of its expedited processing claim where it intended "to
disseminate the information obtained" and its "core mission . . . [was] to inform public
understanding on operations and activities of government"); *Brennan Ctr.*, 498 F. Supp. 3d at 98
("law and public policy group that regularly writes, publishes, and disseminates information
[online]" satisfied the standard (alterations omitted)); *cf. Nat'l Day Laborer Org. Network v. U.S.
Immigr. & Customs Enf't*, 236 F. Supp. 3d 810, 817 (S.D.N.Y. 2017) (concluding plaintiff
nonprofits who merely alleged that they "maintain websites that receive many visits" and "will
widely publish and disseminate [the requested] information to the press and to the public" failed
to show they are primarily engaged in disseminating information).

ASAP easily meets this "urgency to inform" test and therefore is likely to succeed on the
merits that its FOIA Request for the Benefits Pause Memo should be expeditiously processed.

## B.  The Benefits Pause Memo Impacts People's Lives and Physical Safety

Second, and independently, there is a "compelling need" for expedition here because the
Benefits Pause Memo leaves an unknown number of the approximately 800,000 parolees
impacted by the Memo imminently vulnerable to removal to countries where their physical
safety or lives are in danger. *See* 5 U.S.C. § 552(a)(6)(E)(v)(I); 6 C.F.R. § 5.5(e)(1)(i).  The

---

*Immigrants to Get Extension for Expiring or Expired U.S. Work Permits*, THE WALL ST. J. (May 3, 2022),
https://www.wsj.com/articles/immigrants-to-get-extension-for-expiring-or-expired-u-s-work-permits-11651579201.

Benefits Pause Memo reportedly suspends the adjudication of *all* immigration benefits—including work permits, asylum, TPS, family petitions, applications for lawful permanent residence, and others—for individuals whom the United States previously granted urgent humanitarian parole.  These individuals include Ukrainians displaced by the war with Russia; nationals of Cuba, Haiti, Nicaragua, and Venezuela, countries that have been devastated by natural disasters and political crises; and certain Colombians, Ecuadorians, Salvadorans, Guatemalans, Haitians, Hondurans, and Cubans reuniting with immediate family members in the United States who are eligible to adjust their immigration status based on these close relationships.  *See* Compl. ¶ 16 & Compl., Ex. 1 at 8–9.  Many of these individuals fled oppressive regimes, death threats, and persecution in their home countries, and have pending applications for asylum, TPS, family-based relief, lawful permanent residence, or other relief. *See id.* ¶¶ 17, 29 & Compl., Ex. 1 at 3 n.5.

These parolees are now unable to access critical immigration benefits to which they may be entitled due to the undisclosed Benefits Pause Memo—including adjusting to a more secure immigration status—so, if their current parole status expires or is terminated, are at risk of enforcement actions (whether or not lawful[8]).  Compl. ¶¶ 17, 29.  Enforcement actions of this kind frequently lead to detention and deportation.  Indeed, "[a]s Lynden Melmed, former Chief Counsel of USCIS, explained, the [Benefits Pause] Memo leaves parolees 'susceptible to removal from the country if the government terminates their parole status' or if their parole expires."  Compl. ¶ 29 & Compl., Ex. 1 at 3.  This is set against the backdrop of the current Administration's promises to "deport millions of immigrants," "boasting that it will be the 'largest deportation operation in American history.'"  Ali Bianco, *The US Has Deported*

---

[8] Several of this Administration's immigration enforcement policies announced since January 20, 2025 are currently subject to legal challenges that allege such policies are unlawful.  *See supra* note 3.

*Immigrants En Masse Before. Here's What Happened.*, POLITICO (Dec. 29,

2024), https://www.politico.com/news/magazine/2024/12/29/mass-deportation-immigration-

history-00195729.

      An article cited in ASAP's FOIA Request reveals the devastating situation parolees face:

Carmen, a journalist who was paroled into the United States through CHNV, escaped likely

torture or death in her home country, Nicaragua, and has a pending asylum application. Compl.

¶ 30 & Compl., Ex. 1 at 3 n.5. Upon information and belief, Carmen's asylum application has

been indefinitely paused under the Benefits Pause Memo, and she could be deported if she loses

parole status and is subject to enforcement. Many parolees are in a similarly precarious position;

recently, several impacted people who likewise face deportation to dangerous regimes or

displacement to war-torn nations because of the Benefits Pause Memo filed a class action lawsuit

challenging the undisclosed policy. *See id.* ¶ 31; *Doe v. Noem*, No. 25-cv-10495 (D. Mass. Feb.

28, 2025), ECF No. 1 ¶¶ 15–22 (plaintiffs include parolees who evacuated from Ukraine to

escape war and who fled from Nicaragua to escape government persecution).

      A FOIA request like ASAP's that may help thousands of individuals challenge their

deportations to countries where they would be left "at substantial risk of violence" involves a

"compelling need" warranting expedited processing based on a substantial risk to life and safety.

*See Stevens v. U.S. Dep't of Health and Hum. Servs.*, 666 F. Supp. 3d 734, 746 (N.D. Ill. 2023)

(holding requestor asserted a "compelling need" for documents to help an individual facing risk

of removal to a country in which he would be "left homeless, destitute, and at substantial risk of

violence"). Here, without access to the Benefits Pause Memo, hundreds of thousands of people

are left unable to adequately assess their risk of being subjected to removal proceedings (or

expedited deportation procedures this Administration has sought to expand in scope[9]) or challenge such government action. *See generally* Compl. ¶¶ 22–35.

ASAP must access the Benefits Pause Memo immediately to understand the scope of the benefits pause and whether parolees impacted by the pause could challenge their removal to countries where their physical safety or lives are in danger.

### C.  The Benefits Pause Memo Involves the Loss of Substantial Due Process Rights

Finally, ASAP is likely to succeed on the merits because the Benefits Pause Memo implicates "[t]he loss of substantial due process rights."  6 C.F.R. § 5.5(e)(1)(iii).  The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).  Specifically, all noncitizens have a Fifth Amendment right to due process, including the right to a full and fair hearing in a deportation proceeding, *Reid v. Garland*, 120 F.4th 1127, 1140 (2d Cir. 2024), and to be free from unreasonably prolonged detention, *Black v. Decker*, 103 F.4th 133, 159 (2d Cir. 2024).

The undisclosed Benefits Pause Memo indefinitely suspended *all* pending immigration benefits applications filed by approximately 800,000 parolees, apparently without giving the impacted applicants notice of or an opportunity to challenge the indefinite pause—essentially a constructive denial—of their applications.  Compl. ¶¶ 15–17.  This seriously implicates the parolees' and their U.S.-citizen-family members' due process rights because, as discussed above, impacted individuals are unable to make informed decisions about their cases, may fall out of

---

[9] *See* U.S. Dep't of Homeland Sec., *Designating Aliens for Expedited Removal* (Jan. 21, 2025), https://public-inspection.federalregister.gov/2025-01720.pdf; Benjamine C. Huffman, *Guidance Regarding How to Exercise Enforcement Discretion* (Jan. 23, 2025), https://www.dhs.gov/sites/default/files/2025-01/25_0123_er-and-parole-guidance.pdf.

legal status, and may face detention or deportation—all with no knowledge of the underlying

policy causing such an outcome, and therefore, with no ability to adequately challenge potential

detention or removal.[10]  *See generally id.* ¶¶ 22–35.

* * *

In sum, under any of the three "compelling circumstances" grounds established by FOIA

and DHS regulations, ASAP has established it is likely to succeed on the merits of its claim that

it is entitled to expedited processing of its FOIA Request for the Benefits Pause Memo.

## II.    The Public, ASAP, and Hundreds of Thousands of Directly Impacted Individuals Will Be Irreparably Harmed Absent the Requested Injunctive Relief

The American public, ASAP, and hundreds of thousands of directly impacted parolees

will suffer irreparable harm in the absence of a preliminary injunction ordering USCIS to

expeditiously process ASAP's FOIA Request.  Without such relief, ASAP will continue to be

deprived of its ability to timely inform its over 690,000 members and the public about the

contents and possible effects of the Benefits Pause Memo.  *See* Compl. ¶¶ 22–28.  And for the

roughly 800,000 people who are directly impacted by this Memo, failure to expeditiously

process the FOIA Request may cause irreparable harm to their immigration cases, career

prospects, and even their very lives should they be removed to countries from which they fled.

*Id.* ¶¶ 16, 29–35.

### A.    The Public Is Irreparably Harmed by the Inability Access the Benefits Pause Memo

Irreparable harm consists of "injury that is neither remote nor speculative, but actual and

imminent and that cannot be remedied by an award of monetary damages."  *Brennan Ctr. v. U.S.*

---

[10] This Court's treatment of an expedited processing request in *Ferguson v. F.B.I.*, is instructive.  722 F. Supp. 1137 (S.D.N.Y. 1989).  There, the court held a plaintiff's due process interest in documents needed for use in defending against a future charge that could lead to incarceration, and separately in challenging his then-current incarceration, was sufficient to expedite his FOIA request for those documents.  *Id.* at 1141.

*Dep't of Just.*, No. 17-cv-6335, 2018 WL 637424, at *2 (S.D.N.Y. Jan. 31, 2018) (quoting *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015)).  The irreparable harm inquiry for FOIA "focuse[s] on the public's 'access' to the records as the basis for irreparable harm," and "consider[s] 'public awareness' and the public's 'ability to make its views known in a timely fashion.'"  *Brennan Ctr.*, 498 F. Supp. 3d at 102-03 (internal quotation marks omitted); *see also Protect Democracy Project, Inc.*, 498 F. Supp. 3d at 142 (concluding plaintiff established irreparable harm because the "public has a need to know information regarding investigations into matters potentially affecting voting rights while the inquiries are still ongoing").  Further, in the FOIA context, courts have long recognized that "stale information is of little value."  *Payne Enters., Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988).  That is so because the public's "timely awareness" of "its government's actions is 'a structural necessity in a real democracy.'"  *Brennan Ctr.*, 498 F. Supp. 3d at 101 (quoting *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 172 (2004)).  Accordingly, in cases involving "ongoing proceedings of national importance," "a delay in the release of the requested information" amounts to "irreparable harm."  *Ctr. for Pub. Integrity*, 411 F. Supp. 3d at 12–13 (collecting cases).

**B.    ASAP Is Irreparably Harmed by the Inability to Promptly and Fully Inform Its Members and the Public About the Benefits Pause Memo**

ASAP, whose membership overlaps with the approximately 800,000 people directly impacted by the undisclosed Benefits Pause Memo, will suffer irreparable harm absent injunctive relief.  ASAP's core mission is to provide timely and accurate information to its members and the public, and otherwise to support its members as they navigate the immigration system.  Compl. ¶ 10; *see also* Asylum Seeker Advoc. Project, *About ASAP*, https://help.asylumadvocacy.org/about/.  Without expedited processing of its FOIA Request,

17

ASAP cannot timely inform its members and the public of the contents of the Benefits Pause Memo, which renders its members and the public unable to make informed decisions on individual immigration cases or to fully engage in the ongoing debates and questions regarding recent immigration enforcement efforts more broadly.  Compl. ¶¶ 22–28.

Indeed, 31 days have passed since the issuance of the Benefits Pause Memo and neither ASAP nor its members have any clarity on, for example, (1) which parolees are subject to or exempted from the Benefits Pause Memo; (2) which immigration benefits and applications are the subject of or exempted from the Benefits Pause Memo; (3) whether a parolee can challenge or seek review of a pause on a pending application; (4) if or when the terms of the Benefits Pause Memo will expire; (5) what effects the Benefits Pause Memo will have on individual parolees' immigration cases; or (6) what parolees who are subject to court-ordered relief should do to ensure their applications are processed despite the Benefits Pause Memo.  The inability to promptly and fully answer these questions irreparably harms ASAP's ability to adequately inform its members and the public.  *See, e.g.*, *Stevens*, 666 F. Supp. at 746 (plaintiff's need to "timely inform the public" of the agency's alleged actions "is sufficient to demonstrate that a failure to receive the documents on an expedited basis will cause [the plaintiff] irreparable harm"); *Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*, 470 F. Supp. 3d 32, 38 (D.D.C. 2020) (delay in release of information "to inform the public about ICE's response to the COVID-19 pandemic and the impact of that response on the thousands of immigrant detainees who are presently in ICE custody . . . . would cause irreparable harm."); *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 286 F. Supp. 3d 96, 110 (D.D.C. 2017) ("[W]here an

obligation to disclose exists, plaintiffs may suffer irreparable harm if they are denied access to information that is highly relevant to an ongoing public debate.").[11]

### C.    Directly Impacted People Are Irreparably Harmed by the Inability to Make Informed Decisions on Time-Sensitive and Complex Matters in Their Immigration Cases

The lack of public access to the Benefits Pause Memo is also causing irreparable harm in the lives of approximately 800,000 directly impacted parolees.  With each day that passes, more and more parolees approach statutory, regulatory, and other immigration-related deadlines by which to make decisions in their cases that are obscured by USCIS's non-disclosure of the Benefits Pause Memo.  Compl. ¶ 32.  Without access to the information contained in the Benefits Pause Memo, applicants for immigration benefits will imminently miss deadlines they otherwise would meet, lose out on critical protections they currently rely on, or unintentionally trigger long-term negative consequences in their cases that they cannot anticipate now without access to the Benefits Pause Memo.  *Id.*

In the best of circumstances, immigration law is notoriously complex and nuanced.[12] Without the Benefits Pause Memo it is essentially impossible to assess the full extent of harmful consequences that this policy directive will cause.  For example, the Benefits Pause Memo reportedly has put on hold asylum and work permit renewal applications, two time-sensitive immigration benefits applications.  *Id.* ¶ 33.

---

[11] The failure to expeditiously release the Benefits Pause Memo would not only cause irreparable harm but would also undermine the "basic purpose of FOIA . . . to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).

[12] *See, e.g., Drax v. Reno*, 338 F.3d 98, 99 (2d Cir. 2003) (describing "modern immigration law" as having a "labyrinthine character" and being "a maze of hyper-technical statutes and regulations that engender waste, delay, and confusion for the Government and petitioners alike"); *Lok v. Immigr. & Naturalization Serv.*, 548 F.2d 37, 38 (2d Cir. 1977) (noting the resemblance between immigration law and "King Minos's labyrinth in ancient Crete" in terms of complexity).

As to the deadline for asylum applications, applicants who do not submit applications within one year of arriving in the United States generally lose the ability to qualify.  *See* 8 U.S.C. § 1158(a)(2)(B); *Lin v. Holder*, 763 F.3d 244, 246 (2d Cir. 2014).  Parolees who entered in the last calendar year are approaching the one-year asylum filing deadline every day, yet without timely access to the Benefits Pause Memo, they may reasonably decide to wait for more information before submitting any applications or even assume they cannot currently apply for asylum despite being eligible.  Compl. ¶ 34.  Likewise, attorneys with clients in this situation do not have the basic information needed to provide complete legal advice about whether to apply for asylum in light of the undisclosed Benefits Pause Memo.  *Id.*  Parolees and their counsel have no clarity on whether they can submit an asylum application and comply with the deadline; whether the one-year deadline may be tolled in this situation; or whether some other course of action is appropriate.  Without timely access to the information in the Benefits Pause Memo, these individuals risk missing the one-year deadline and losing their asylum eligibility altogether, all while deprived of information needed to make important case decisions.  *Id.*

As to work permits, many parolees are now eligible to renew their permits in various eligibility categories.  To ameliorate the impacts of USCIS's extreme processing backlogs for work permit renewals,[13] certain work permit renewal applicants (including asylum seekers) are entitled to an automatic extension of their work permit for 540 days past their current permit's listed expiration date, *but only if* they file their renewal application prior to the date their current

---

[13] As of October 22, 2024, there were 1.4 million work permit applications "awaiting processing—including roughly . . . 500,000 seeking renewals."  Letter from Sen. Elizabeth Warren, et al., to Dep't of Homeland Sec. Sec'y Alejandro Mayorkas and U.S. Citizenship & Immigr. Servs. Dir. Ur Jaddou at 2 (Oct. 22, 2024), https://aboutblaw.com/bf2u.  USCIS's backlog in processing work permit applications is so concerning that, in Fiscal Year 2024, Congress appropriated $34 million for USCIS to reduce its work permit processing backlog, which is more than has ever been appropriated for this purpose.  U.S. S. COMM. ON APPROPRIATIONS, BILL SUMMARY: HOMELAND SEC'Y FISCAL YEAR 2024 APPROPRIATIONS BILL (Mar. 21, 2024), https://www.appropriations.senate.gov/news/majority/bill-summary-homeland-security-fiscal-year-2024-appropriations-bill-2.

work permit expires.  *Id.* ¶ 35; *see also* U.S. Citizenship & Immigr. Servs., *Automatic Employment Authorization Document (EAD) Extension* (Jan. 13, 2025), https://www.uscis.gov/eadautoextend.  Without the automatic extension, hundreds of thousands of people who timely file their work permit renewal application will see their current work permit lapse.[14]  The automatic extension is therefore critical to prevent employment-authorized workers from falling out of the workforce solely due to agency delays.[15]

Parolees are approaching their work permit expiration dates every day with no understanding of whether they can or should file renewal applications in light of the news reports of the benefits pause.  If people who are eligible for the automatic 540-day extension fail to file their renewal application before their current work permit expires, they face the high risk that their current permit will expire before their renewed permit is issued, "losing their ability to work legally because of bureaucratic delays out of their control" and compromising their ability to support their family and contribute to the U.S. economy.  Kreighbaum, *supra* note 15 (quoting Sen. Elizabeth Warren).[16]

---

[14] Adriel Orozco, *Businesses and Workers Get Win with Permanent Work Permit Extension Rule*, IMMIGR. IMPACT (Dec. 13, 2024), https://immigrationimpact.com/2024/12/13/biden-permanent-work-permit-extension-rule/ ("USCIS estimates that the permanent extension will save workers and business owners billions of dollars" and prevent "between 306,000 and 468,000 applicants for work permit renewals" from "experienc[ing] a lapse in employment authorization").

[15] *See, e.g.*, Andrew Kreighbaum, *DHS Extends Duration of Immigrant Work Permits in New Rule (2)*, BLOOMBERG L. (Dec. 10, 2024), https://news.bloomberglaw.com/daily-labor-report/dhs-extends-duration-of-immigrant-work-permits-in-new-rule ("'With this final rule, DHS has ensured that ASAP members and other immigrants will not fall out of the workforce because of work permit processing backlogs,' [co-executive director of ASAP, Conchita Cruz,] said."); Letter from 110 Business Leaders to Dep't of Homeland Sec. Sec'y Alejandro Mayorkas, Domestic Policy Council Dir. Neera Tanden, & U.S. Citizenship & Immigr. Servs. Dir. Ur Jaddou at 2 (Oct. 25, 2024), https://www.uscis.gov/sites/default/files/document/foia/WorkPermitBacklog-AmericanImmigrationCouncil.pdf (hereinafter, "Letter from 110 Business Leaders") ("Processing work permit applications quickly has a direct positive impact on maintaining and growing immigrants' invaluable contributions to the U.S. workforce.  Their talent and skills make the United States more competitive at a global level and help fill shortages in critical industries such as healthcare, education, construction, and hospitality." (embedded links omitted)).

[16] This also harms employers:  when workers unexpectedly lose work authorization, they must be dropped from the workforce and be replaced or their roles held open indefinitely, either of which puts significant strain on businesses that already face labor shortages.  Compl. ¶ 35; *see also, e.g.*, Letter from 110 Business Leaders, *supra* note 15 at 1 ("[T]alented and eager immigrant workers are unable to participate in the job market because they must wait for over a year to . . . renew their work authorization with [USCIS]."); Stephanie Ferguson Melhorn, *Understanding*

Courts have recognized that delay in producing a document amounts to irreparable harm where the requested document is "time-sensitive and highly probative, or even essential to the integrity, of an imminent event, after which event the utility of the [document] would be lessened or lost." *N.Y. Times Co. v. Def. Health Agency*, No. 21-cv-566, 2021 WL 1614817, at *8 (D.D.C. Apr. 25, 2021) (internal citation and quotation marks omitted). That is precisely the case here with the Benefits Pause Memo's implications for the asylum one-year filing deadline, the renewal deadline for work permit extension eligibility, and perhaps any number of other yet-unknown examples in the highly complex and nuanced legal field of immigration law.[17] *See Am. Oversight v. U.S. Dep't of State*, 414 F. Supp. 3d 182, 186 (D.D.C. 2019) (Where "time is necessarily of the essence, the harm in agency delay is more likely to be irreparable." (internal citation and quotation marks omitted)). With each passing day, USCIS's delay in processing ASAP's FOIA Request renders the requested information "stale" as to more and more individuals. *Payne Enters., Inc.*, 837 F.2d at 494. Under these circumstances, ASAP and the approximately 800,000 parolees subject to the Benefits Pause Memo will suffer irreparable harm absent expeditious FOIA processing and prompt production of the Benefits Pause Memo, because "but for the grant of equitable relief, there is a substantial chance that upon final

---

*America's Labor Shortage*, U.S. CHAMBER OF COM. (Feb. 11, 2025), https://www.uschamber.com/workforce/understanding-americas-labor-shortage ("[T]he latest data shows that we have 8 million job openings in the U.S. but only 6.8 million unemployed workers.").

[17] For example, the interaction of the Benefits Pause Memo with other ongoing immigration policy changes, such as the Administration's directive to end certain parole programs, *see* Exec. Order 14165, 90 Fed. Reg. 8467, 8468 (Jan. 20, 2025) (ordering the "terminat[ion]" of "all categorical parole programs that are contrary to the policies of the United States"), has a number of yet-unknown ripple effects on issues such as the accrual of unlawful presence and triggering of the 3- and 10-year bars to re-entry for former parolees. *See* 8 U.S.C. §§ 1182(a)(9)(B)(i)(I)-(II) (rendering noncitizens inadmissible for 3 years if they have been unlawfully present in the United States for more than 180 days but less than 1 year, and for 10 years if they have been unlawfully present in the United States for more than 1 year); 8 U.S.C. § 1182(a)(9)(B)(ii) (unlawful presence begins to accrue if the noncitizen "is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled").

resolution of the action the parties cannot be returned to the positions they previously occupied."

*Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).[18]

## III.    The Balance of Equities and the Public Interest Favor Injunctive Relief

Where, as here, the Government is the defendant, the balance of equities and public

interest factors merge.  *Goldstein v. Hochul*, 680 F. Supp. 3d 370, 402 (S.D.N.Y. 2023).  The

balance of equities and the public interest weigh decisively in ASAP's favor because no other

interests would be harmed by granting the requested relief, and there is a compelling public

interest in the immediate release of the Benefits Pause Memo.

FOIA commands that requests be processed expeditiously in these exact circumstances.

*See* 5 U.S.C §§ 552(a)(6)(E)(i)(I)–(II) (providing for expedited processing when the requestor

"demonstrates a compelling need" or "in other cases determined by the agency"); *supra*

Argument Part I (ASAP likely to succeed on the merits that it has demonstrated a compelling

need on three independent grounds).  Accordingly, neither USCIS nor other FOIA requestors can

be harmed by USCIS being forced to comply with its own statutory and regulatory obligations.

*See Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977) (recognizing "an

overriding public interest . . . in the general importance of an agency's faithful adherence to its

statutory mandate"); *Wash. Post v. U.S. Dep't of Homeland Sec.*, 459 F. Supp. 2d 61, 76 (D.D.C.

2006) ("If anything, the public's interest in this case is best assessed through the statutory

provisions passed by the public's elected representatives."); *Ctr. for Pub. Integrity*, 411 F. Supp.

3d at 14 ("the hardship on other FOIA requesters is not a bar to relief").[19]

---

[18] As discussed above, parolees and their legal service providers are not the only members of the public harmed by this lack of prompt access to information, but also their families, employers, and communities.

[19] Moreover, USCIS must routinely disclose policy documents like the Benefits Pause Memo under the FOIA's public disclosure requirements, *see* 5 U.S.C § 552(a)(2)(B) (requiring the disclosure of "statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register"), and has released such documents in the recent past, *see* U.S. Citizenship & Immigr. Servs., POLICY MEMORANDUM:

Further, any burden to USCIS would be minimal at most because ASAP's FOIA Request requires processing of only a single, non-exempt document that was recently created. *See, e.g.*, *Protect Democracy Project, Inc.*, 498 F. Supp. 3d at 144 (explaining that agency would not "face a particularly heavy burden," where FOIA request was "relatively limited in that it only seeks 'communications' regarding a narrowed subject matter and time period"); *Ctr. for Pub. Integrity*, 411 F. Supp. 3d at 14 (explaining that hardship to defendant agencies was "minimal" because plaintiff's FOIA request required processing of "only approximately 211 pages" of "only non-exempt information").

For these reasons, the balance of equities and public interest weigh decisively in favor of ordering USCIS to expeditiously process ASAP's FOIA Request and promptly produce the Benefits Pause Memo.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiff Asylum Seeker Advocacy Project respectfully requests that the Court issue a Preliminary Injunction directing Defendant U.S. Citizenship and Immigration Services to expeditiously process the FOIA Request and promptly produce the Benefits Pause Memo.

//

//

//

//

//

//

---

ISSUANCE OF NOTICES TO APPEAR (NTAS) IN CASES INVOLVING INADMISSIBLE AND DEPORTABLE ALIENS (Feb. 28, 2025), https://www.uscis.gov/sites/default/files/document/policy-alerts/NTA_Policy_FINAL_2.28.25_FINAL.pdf.

Dated: March 17, 2025

Respectfully submitted,

_/s/ **Joshua Colangelo-Bryan**_

Jessica Hanson*
Marcela Johnson*
ASYLUM SEEKER ADVOCACY PROJECT
228 Park Ave. S., #84810
New York, NY 10003-1502
(646) 647-6779
jessica.hanson@asylumadvocacy.org
marcela.johnson@asylumadvocacy.org

Joshua Colangelo-Bryan
Anwen Hughes*
HUMAN RIGHTS FIRST
75 Broad Street, 31st Floor
New York, NY 10004
ColangeloJ@humanrightsfirst.org
HughesA@humanrightsfirst.org
(212) 845-5243

* *Motion for admission* pro hac vice *forthcoming*

*Attorneys for Plaintiff Asylum Seeker Advocacy Project*

## **WORD COUNT CERTIFICATION**

I hereby certify that, excluding the caption, table of contents, table of authorities, signature block, and this certification, the foregoing Memorandum of Law contains 7,918 words, calculated using Microsoft Word, which complies with Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York.

Dated: March 17, 2025                          Respectfully submitted,

_/s/ Joshua Colangelo-Bryan_____
Joshua Colangelo-Bryan

*Attorney for Plaintiff Asylum Seeker Advocacy Project*

## CERTIFICATE OF SERVICE

I hereby certify that at the time of filing on March 17, 2025, counsel for Defendant had not yet entered an appearance in the above-captioned case.  Therefore, notice of ASAP's Motion for a Preliminary Injunction, and Order to Show Cause, were sent to the Chief of the Civil Division for the U.S. Attorney's Office for the Southern District of New York, Jeffrey Oestericher, via electronic mail on March 17, 2025.

 */s/ Joshua Colangelo-Bryan*
Joshua Colangelo-Bryan

*Attorney for Plaintiff Asylum Seeker Advocacy Project*